IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL MALCOLM | CRIMINAL ACTION<br><br>NO. 22-0114 |

**PAPPERT, J.**                                                                                                                 November 10, 2022

## MEMORANDUM

Michael Malcolm was charged by indictment with two counts of robbery which interferes with interstate commerce in violation of 18 U.S.C. § 1951(a) and two counts of using and carrying a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii). (ECF 8.) The charges stem from Malcolm's alleged armed robbery and attempted armed robbery of two stores—the Illadelph by All in One Smoke Shop and Somerton Beverage—in Northeast Philadelphia. Shortly after the incidents, Philadelphia police officers brought the three victims to view Malcolm at a "show-up" identification conducted in the vicinity of the crimes.

Malcolm moved to suppress the victims' purported identifications as well as the contents of a cell phone seized during his arrest. Malcolm also sought to prevent "any other government witnesses" from "making any future in-court identifications of Mr. Malcolm at evidentiary hearings and trial." (ECF 14.) The Government subsequently told the Court that it would not contest the Motion with respect to the cell phone contents. (ECF 22.)

The Court held an evidentiary hearing and oral argument on the Motion to Suppress the three victims' identifications. (ECF 28.) Before testimony began, the

1

Government conceded that part of the Motion concerning the identifications by the two Somerton Beverage employees, C.K. and A.K., (Supp. Hrg. Tr. 8:12–25, ECF 31), leaving for the Court the issue of whether to suppress the identification by J.P., the Illadelph robbery victim.

The Government did not call J.P. to testify at the hearing. It instead presented three Philadelphia police officers, only one of whom, Nicholas Halbherr, provided testimony directly relevant to the Illadelph robbery victim's identification of Malcolm. Officer Halbherr investigated the Illadelph robbery and brought J.P. to view Malcolm at the show-up. The other two witnesses, Officer Christopher Adams and Officer Michael Mitchell, testified to the Somerton Beverage robbery investigation and Malcolm's arrest. The Government also introduced surveillance video of the Illadelph robbery.

Based on the evidence and testimony from the hearing, Malcolm proved by a preponderance of the evidence that the show-up at which J.P. identified him as the robber was unnecessarily suggestive and that there was a substantial risk of misidentification. The Court thus grants Malcolm's Motion in large part and suppresses the evidence from the cell phone; J.P., C.K. and A.K.'s out-of-court identifications; and any future in-court identification of Malcolm as the robber by J.P., C.K. or A.K. The Court denies that part of Malcolm's Motion which seeks to suppress future in-court identifications by other government witnesses.

I

In early October of 2021, an individual wearing a distinctive jacket perpetrated a string of "gunpoint commercial robberies" in Northeast Philadelphia. (Supp. Hrg. Tr.

72:15–20.) On October 5, officers in the area of those crimes received "flash" information—a brief "description of a person who was involved in a crime"—to be on the lookout for a Black male wearing a black jacket with camouflage sleeves. (*Id.* 20:2–11.) That evening, the Illadelph Smoke Shop on Bustleton Avenue was robbed at gunpoint. (*Id.* 48:12–49:24; Illadelph Surveillance Video, Government's Ex. 8.) Officers went to the shop, and the cashier showed them surveillance video of the incident. (Supp. Hrg. Tr. 93:1–6.) In the video, a Black man wearing a face mask and a black hooded jacket with camo sleeves approaches the register while the cashier scans a small packet and places it on the counter. (Government's Ex. 8 at 00:00:06–00:00:13.) The man hands the cashier a five-dollar bill, then pulls three one-dollar bills from his jacket pocket and hands two to the cashier. (*Id.* 00:00:14–00:00:22.) When the cashier opens the till, the man pulls a black handgun from his pocket and points it at the cashier. (*Id.* 00:00:24–00:00:31.) The robber then reaches across the counter and grabs cash from the register. (*Id.* 00:00:31–00:0047.) After making the cashier show him his wallet, which is empty, the robber grabs a roll of quarters from the register and leaves the store. (*Id.* 00:00:53–00:01:24.)

While officers were still processing the Illadelph robbery scene, "a robbery alarm came out for [the Somerton Beverage] beer distributor that was about a block away." (Supp. Hrg. Tr. 95:8–10.) Officer Adams, who was on patrol nearby, heard the flash description from the Somerton Beverage robbery—a Black male wearing a black jacket with camo sleeves. Shortly thereafter, he noticed Michael Malcolm, who fit that description, standing on the sidewalk by Somerton Beverage. (*Id.* 20:21–21:5, 74:2–5.) Adams tried to stop Malcolm, but he ran into the courtyard of a nearby apartment

complex. (*Id.* 21:6–8.) Adams pursued him and, with the assistance of other officers who happened to be nearby, captured Malcolm in the apartment parking lot. (*Id.* 21:18–22:25.) During the brief struggle, Malcolm's jacket came off. (*Id.* 76:25–77:4.)

Malcolm was handcuffed and placed in the back of a paddy wagon parked behind one of the buildings in the apartment complex. (*Id.* 35:14–15, 63:11–13.) Police brought that evening's victims to the arrest scene—first the two from Somerton Beverage, then the Illadelph cashier—to tell them whether Malcolm was the perpetrator. (*Id.* 84:19–86:10, 97:24–98:1.) Officer Halbherr, who accompanied the Illadelph victim, J.P., testified that when he arrived, there were "lots of" police officers at the scene and he had to park around the side of the building because "the road was basically filled with Police cars." (*Id.* 96:1–97:8.) After making sure the victims of the Somerton Beverage robbery were finished with their identification, he brought J.P. down to stand about fifteen to twenty feet from the paddy wagon. (*Id.* 99:16–22.) An officer removed Malcolm, who was in handcuffs, from the cage in the back of the paddy wagon and had him stand, stooped over, on the wagon's back step. (*Id.* 108:24–25; 109:8:16.) A uniformed officer stood beside him, with the black jacket with camo sleeves in his hand. (*Id.* 99:6–9.) It was dark out, but Malcolm was illuminated by the lights in the back of the paddy wagon and a spotlight from the front of another squad car. (*Id.* 42:22–43:21.)

Malcolm was the only person in the paddy wagon during the show-up, and no other suspects were presented to J.P. for identification. (*Id.* 100:4–9.) Officer Halbherr testified that when Malcolm was brought out of the wagon, the Illadelph victim "immediately looked at him for probably about 10 seconds and was like, yeah, that's the

guy that robbed the store. And that was the jacket he was wearing." (*Id.* 99:10–15.) While Halbherr testified that the area was well lit and that he could see the suspect clearly, (*Id.* 98:20), he could not, when asked to do so, identify Malcolm in the courtroom, because he said it was "hard to see" on the night of the arrest. (*Id.* 98:22–25.)

## II

On a motion to suppress, the movant bears the burden of showing a constitutional violation by a preponderance of the evidence. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). An identification procedure violates due process if it is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification. *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977)).

### A

"Show-up" procedures, where a single individual fitting the perpetrator's description is presented to the witness for identification, are "inherently suggestive" because "by [their] very nature," they imply that "the police think they have caught the perpetrator of the crime." *Id.* at 138. But they are not always "unnecessarily suggestive." "Unnecessary suggestiveness 'contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures.'" *Id.* (quoting *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991)).

In *Brownlee*, the Court of Appeals for the Third Circuit found that the show-up identification of a suspected carjacker was unnecessarily suggestive. There, a man

5

carjacked a woman in a K-Mart parking lot, crashed the stolen car while driving through a nearby town, and fled on foot. *Id.* at 134–35. Officers arrested the defendant as a suspect in the carjacking and brought him to the scene of the accident. *Id.* at 136. Police also brought the victim and a witness, who had been interviewed together at the K-Mart, to the place of the accident to identify the defendant together. *Id.* at 138. During the identification, the defendant was handcuffed, standing next to a police car, and surrounded by law enforcement officers. *Id.* No other suspect was presented to the victim or witness at any time. *Id.*

Here, Officer Halbherr testified that when he brought J.P., the Illadelph robbery victim, to identify Malcolm, the area was so full of police cars that he had to park "at the top" of the intersection. (Supp. Hrg. Tr. 108:2–7.) Malcolm stood, handcuffed and "hunched over," on the back step of the paddy wagon during the identification. (*Id.* at 109:8–16, 25.) No other suspects were presented for identification. (*Id.* at 100:4–9.) These circumstances, combined, made the identification procedure overly suggestive.

An otherwise overly suggestive show-up identification may be necessary where there is an "imperative" need for an immediate identification. *Stovall v. Denno*, 388 U.S. 293, 302 (1967) (show-up procedure justified where victim was in the hospital and might not survive). None of the officers who testified, however, addressed why using a less suggestive procedure was not an option. To the contrary, the Government conceded at oral argument that the officers would have arrested Malcolm for the robberies even if "none of the victims could ID him," (*Id.* 124:13–15), compelling the conclusion that an immediate identification was anything but imperative. Not that they discussed this in their testimony, but to the extent the officers may have wanted to

6

quickly see if Malcolm was the robber and maybe then let him go if he wasn't, the Third Circuit rejected that rationale in *Brownlee*, where "none of the witnesses was in critical condition or otherwise unable to withstand a temporary delay." *Brownlee*, 454 F.3d at 138 n.4; *see also United States v. Shavers*, 693 F.3d 363, 383 (3d Cir. 2012) (although fact that perpetrator was armed added some "urgency" to identification, it did not justify failure to minimize suggestiveness of procedure). The Illadelph victim was uninjured and able to wait until a less suggestive identification could be arranged—in fact, he went to the police station for an interview following the show-up. (J.P. Interview Report, Def.'s Ex. 2.)

B

An unnecessarily suggestive identification will only be suppressed if it lacks sufficient indicia of reliability. The Court must look to (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness' degree of attention," (3) "the accuracy of the witness' prior description of the criminal," (4) "the level of certainty demonstrated by the witness at the confrontation" and (5) "the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

The first factor asks whether the identifying witness had the opportunity to view the perpetrator for a sufficient time, in adequate light, with a full view of the person's face. Again, the Illadelph robbery victim did not testify, so the only evidence in the record regarding his opportunity to view the robber during the crime is what can be gleaned from the surveillance video. The shop was well lit, and the interaction between the victim and the robber lasted approximately a minute and a half. (Government's Ex.

8, at 00:00:00–00:01:24.) The victim was able to view the robber from a very close range—they stood facing each other, separated only by the counter. (*Id.*) The robber, however, wore a face mask for the entire encounter. (Supp. Hrg. Tr. 109:5–7.) The video also does not clearly show where the victim was looking during the encounter—the camera was positioned above and behind him. The environmental aspects of this encounter—the lighting, length of the interaction, and proximity to the perpetrator—weigh in favor of reliability but are mitigated by the fact that most of the robber's face was obscured.

The second and third *Biggers* factors have no bearing on the case. *See Shavers*, 693 F.3d at 385. The Court has no way of assessing the victim's degree of attention during the robbery, and no inferences about it can be drawn from the surveillance video. Nor is there any evidence in the record suggesting that J.P. described the robber before he was taken to identify Malcolm in the paddy wagon. At the hearing, the Government urged the Court to treat the surveillance video that J.P. showed to police as a "description" of the robber. (Supp. Hrg. Tr. 132:17–133:3.) But the video is not probative of J.P.'s ability to recall the robber's appearance at the identification, so it cannot be used to assess the third *Biggers* factor.

The fourth *Biggers* factor assesses the identifying witness's degree of certainty that the defendant was the perpetrator. The only evidence on this point is the testimony of Officer Halbherr. And while the Government was not required to put J.P. on the stand, his absence made Halbherr's description of what J.P. purportedly did and said crucial. Halbherr stated that, from a distance of about fifteen to twenty feet, "the Complainant immediately looked at [Malcolm] for probably about 10 seconds and was

like, yeah, that's the guy that robbed the store. And that was the jacket that he was wearing." (Supp. Hrg. Tr. 99:10–12, 22–23.) There is no evidence that the victim expressed his *degree* of confidence in the identification. J.P.'s unequivocal yet lukewarm reaction weighs modestly in favor of reliability. *Compare United States v. Hopper*, No. 19-538, 2020 WL 614621, at *6 (E.D. Pa. Oct. 20, 2020) (fourth factor supported reliability "to an extent" where officer testified that witness "seemed pretty sure" the defendant was the carjacker), *with Biggers*, 409 U.S. at 200 (fourth factor supported reliability where victim had "no doubt" that defendant was the person who raped her).

Whatever this testimony adds to the *Biggers* analysis, however, is undermined by Officer Halbherr's contradictory testimony about J.P.'s purported ability to see Malcolm clearly. On direct examination, Halbherr testified to the lighting conditions during the identification. He stated that "it was very easy and clear to see" the suspect. (Supp. Hrg. Tr. 98:20.) Counsel then asked if the individual who was identified as the robber at the show-up was in court that day. Halbherr could not identify the defendant, who was seated without a mask at counsel table (a similar distance from the witness stand as the distance from Halbherr and J.P. to Malcolm at the show-up) in a well-lit courtroom, as the suspect. He said, "Actually, I—it was hard to see. I'm not positive honestly." (*Id.* 98:22–25.) This greatly diminishes the weight the court can assign Officer Halbherr's characterization of what J.P. could see at the show-up and leaves the Court unable to assess the degree of certainty with which he identified Malcolm as the robber.

9

Of the three *Biggers* factors the Court is able to analyze based on the record, only one—the short time between the crime and the identification—weighs fully in favor of reliability.  The other two factors are not strong enough for the Court to conclude that the identification was sufficiently reliable.  The victim's clear opportunity to view the robber during the crime was diminished by the fact that much of the robber's face was obscured by a mask—which Malcolm was not wearing during the identification.  And although Officer Halbherr stated that the victim unequivocally identified Malcolm as the robber, the Court cannot fully credit his testimony, which ended up being an insufficient proxy for J.P.'s own account.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*<br>GERALD J. PAPPERT, J.